No. 16-3228

## In The
## United States Court of Appeals
## For The Eighth Circuit

### Davenport Chester, LLC

*Plaintiff - Appellant*

v.

### Abrams Properties, Inc. and SciEnergy, Inc.

*Defendants - Appellees.*

On Appeal from the United States District Court for the Southern District of Iowa, No. 3:15-cv-70-SMR-SBJ

## REPLY BRIEF OF APPELLANT

Daniel E. Izenson
Michael T. Cappel
KEATING MUETHING & KLEKAMP PLL
One East Fourth Street, Suite 1400
Cincinnati, Ohio 45202
Tel: (513) 579-6480
Fax: (513) 579-6457
dizenson@kmklaw.com
mcappel@kmklaw.com

Robert V.P. Waterman, Jr.
Douglas R. Lindstrom, Jr.
LANE & WATERMAN LLP
220 N. Main Street, Suite 600
Davenport, Iowa 52801
Tel: (563) 333-6618
Fax: (563) 324-1616
bwaterman@l-wlaw.com
dlindstrom@l-wlaw.com

*Attorneys for Plaintiff - Appellant Davenport Chester, LLC*

# TABLE OF CONTENTS

I. INTRODUCTION ..................................................................1

II. RESPONSE TO APPELLEES' STATEMENT OF FACTS .........................2

III. SECTION 26.01 IS BOTH AMBIGUOUS AND REPUGNANT TO THE LEASE ....................................................................3

 A. Section 26.01 Conflicts with Article 6's Repair and Maintenance Obligations...................................................................4

 B. Section 26.01 Conflicts with Section 8.01 .......................................7

 C. Section 26.01 Conflicts with Section 13.01 ....................................9

 D. Section 26.01 Conflicts with the Indemnification Provisions......................10

 E. Contracts Must be Read in Their Entirety, and Repugnant Clauses May be Disregarded by the Court ................................................13

IV. SECTION 26.01 OF THE LEASE IS AMBIGUOUS BECAUSE ITS LANGUAGE IS SUSCEPTIBLE TO TWO INTERPRETATIONS ............14

V. CONCLUSION................................................................21

# TABLE OF AUTHORITIES

## Cases

*Allen v. Highway Equipment Co.*, 239 N.W.2d 135, 139 (Iowa 1976) ....................8

*De Stefano v. Apt Downtown, Inc.*, 879 N.W.2d 155 (Iowa 2016) .........................14

*Estate of Pearson v. Interstate Power & Light Co.*, 700 N.W.2d 333, 344 (Iowa 2005)...................................................................11

*Holmes v. Pension Plan of Bethlehem Steel Corp.*, 213 F.3d 124 (3d Cir. 2000).....8

*In re Riverside Nursing Home*, 102 B.R. 357, 361-61 (Bankr. S.D.N.Y. 1989).....18

*Luedecke v. Des Moines Cabinet Co.*, 118 N.W. 456, 457 (Iowa 1908)................17

-i-

*Magina v. Bartlett*, 582 N.W. 2d 159, 163 (Iowa 1998)..........................................16

*Mealey v. Kanealy*, 226 Iowa 1266, 1277 (1939).............................................. 13, 14

*Teig & Johnson v. Speelmon*, 261 Iowa 210, 216 (1967)................................. 13, 14

*The Pillsbury Co., Inc.*, 752 N.W. 2d430, 435 (Iowa 2008) ...................................13

*Van Sloun v. Agans Bros.*, 778 N.W.2d 174, 179 (Iowa 2010) ..............................15

*Walsh v. Nelson*, 622 N.W.2d 499, 503 (Iowa 2001) ..............................................15

## Other Authorities

41 Am. Jur. 2d Indemnity § 1 ....................................................................................10

Black's Law Dictionary 783-84 (8th ed. 2004) .......................................................11

Appellate Case: 16-3228    Page: 3    Date Filed: 11/29/2016 Entry ID: 4473858

# I. INTRODUCTION[1]

Contrary to Tenant's contentions, Landlord is not seeking a "re-do" of the Lease—Landlord is merely seeking to enforce the contractual provisions it bargained for. (*See* Appellees' Brief at 16). Landlord specifically bargained for provisions in this triple net Lease to avoid being saddled with expensive repair and maintenance costs, particularly upon termination of the Lease. Throughout the Lease, the obligation was squarely on Tenant to keep the Premises in first class order, repair and condition, and free of waste. Despite Tenant's arguments to the contrary, upon default, the Lease afforded Landlord multiple remedies for non-compliance, including reimbursement of attorney's fees. Tenant does not contest that it did ***not*** perform its repair and maintenance obligations under the Lease. And Tenant does ***not*** contest the opinion of Landlord's property condition expert who found that the Premises needed over $2 million in repairs following Tenant's surrender, or the opinion of Landlord's appraisal expert who stated that the Premises was diminished in value by over $1.3 million.

Instead, Tenant clings to a strained reading of a singular provision of the Lease—the exculpatory clause found in Section 26.01—which clearly conflicts with multiple other provisions of the Lease, to relieve it of all its obligations and to leave the Premises in utter disrepair. The District Court simply got it wrong and

---

[1] Capitalized and defined terms shall have the same meaning as set forth in Landlord's Opening Brief.

-1-

granted the drastic remedy of summary judgment to Tenant where there was plainly room for controversy. Upon this Court's *de novo* review of the record before it, including the unrebutted Affidavit of the original Landlord, Lawrence Kadish, who affirmed that the Lease was not intended to exculpate the Tenant of its repair and restoration obligations particularly upon surrender, when taking into account the Lease was drafted by Tenant, and when viewing the evidence in a light most favorable to Landlord with the benefit of all reasonable inferences, it is clear that the District Court erred in granting Tenant's Motion for Summary Judgment. The District Court's decision should be reversed and remanded.

## II.  RESPONSE TO APPELLEES' STATEMENT OF FACTS

Before addressing Tenant's legal arguments, Landlord must clarify the record regarding some factual misstatements made by Tenant. Throughout Appellees' Brief, Tenant claims that Landlord "handsomely profited" from the Lease in the amount of $6.5 million with "essentially no ongoing expenses concerning the Property." (*See, e.g.*, Appellees' Brief at 3-4, 16). Tenant continues to incorporate this red herring in its briefing that Landlord's purported profits somehow reduce Tenant's obligations under the Lease. This is untrue. But beyond this simple untruth, Tenant's counsel's erroneous statements to the District Court that Tenant only profited $51,903 annually, while also carrying the burden of constructing the Kmart building, were also unfounded. The Supplemental

-2-

Briefing before the District Court put Tenant's counsel's argument to rest. In fact, Mr. Kadish paid approximately $2.2 million to Tenant for land in fee simple and the building and improvements under construction, while Tenant then became the sub-landlord to Kmart. In the context of the entire financial transaction, Tenant's repair, maintenance, and surrender obligations under Article 6 make sense because Landlord bore the risk of paying for the entirety of this development upfront, and the Lease was put in place to protect the Landlord's interest that it would be paid back over time. The evidence submitted by Landlord on this point was unrebutted.

Tenant's suggestion that the parties somehow intended to limit the contractual rights of Landlord for Tenant's breaches and defaults to only termination, since it seemed that Landlord was getting the better "benefit of the bargain," are simply unsupported by the record below. Tenant's argument is grounded in lawyer rhetoric and ignores the evidence concerning the entire financial transaction between the parties and the requirements set forth in the entirety of the Lease.

## ARGUMENT

### III. SECTION 26.01 IS BOTH AMBIGUOUS AND REPUGNANT TO THE LEASE

The District Court found that Section 26.01 was "plainly worded" and "not susceptible of more than one interpretation." (J.A. 827). Tenant likewise argues that "Section 26.01 is consistent and harmonious with the other provisions of the

Appellate Case: 16-3228     Page: 6     Date Filed: 11/29/2016 Entry ID: 4473858

Lease and must be enforced as written." (Appellees' Brief at 17). But both the District Court and Tenant contort the language of the other Lease provisions and make forced interpretations to support this conclusion.

Simply put, Tenant's interpretation of Section 26.01 cannot be held to be harmonious with Article 6's repair and maintenance obligations. Landlord maintains that Section 26.01 is ambiguous when the Lease is read in its entirety, specifically when read in conjunction with Articles 6, 8, and 13. Because of the ambiguity of Section 26.01, it permits the introduction of extrinsic evidence or it should be disregarded as repugnant to the Lease.

## A. Section 26.01 Conflicts with Article 6's Repair and Maintenance Obligations

Tenant submits that termination of the Lease under Section 26.01 is a "powerful remedy, which provided Landlord substantial leverage." (Appellees' Brief at 18). Tenant then suggests that "nothing in Section 26.01 relieves Tenant of its obligations to perform under the Lease, including carrying out its repair and maintenance obligations." (*Id*. at 19). Tenant conveniently ignores the fact that by reading Section 26.01 to limit Landlord's sole remedy to termination of the Lease, it effectively eviscerates Tenant's obligations.

Landlord is not seeking a "re-do" of the contract—Landlord is merely seeking to enforce the contractual provisions it bargained for. (*See* Appellees' Brief at 16). For instance, Article 6 of the Lease sets forth several repair and

-4-

maintenance obligations of Tenant, including Tenant's promise to "assume the full and sole responsibility for the condition, renovation, operating, ***repair, replacement, maintenance, and management*** of the Demised Premises." (*See* Section 6.01, J.A. 153) (emphasis added). Tenant also agreed to "***take good care of*** the Demised Premises, ***make all repairs thereto***, interior and exterior, structural and non-structural, ordinary and extraordinary, foreseen and unforeseen, and ***shall maintain and keep the said Demised Premises and the parking lots and driveways in first class order, repair, and condition***[.]" (*See* Section 6.04, J.A. 154) (emphasis added). Tenant likewise promised that it would "***not do or permit or suffer any waste, damages,*** disfigurement or injury to or upon the Demised Premises or any part thereof." (*See* Section 6.08, J.A. 156-157) (emphasis added).

Notably, Tenant does not contest that it did ***not*** perform its repair and maintenance obligations under the Lease, and Tenant also does ***not*** contest the findings of the PCA Report, which recommended that the Premises needed over $2 million in repairs. Instead, Tenant's position is that Landlord's ***only*** remedy for Tenant's complete abandonment of its repair and maintenance obligations was termination pursuant to Section 26.01. Here, Landlord terminated the Lease after Tenant was delinquent on rent payments for several months in a row, a reasonable step Landlord took in order to mitigate its damages. (*See* July 30, 2012 Letter from Landlord's counsel to Tenant, (J.A. 228-229) informing Tenant it would be

-5-

terminating the Lease effective September 12, 2012, with full reservation of rights). Landlord expressly advised Tenant that termination of the Lease was "subject to Tenant's continuing obligations under the Lease." (*Id.*) It was only ***after*** Landlord terminated the Lease that it discovered the dilapidated condition of the Premises. According to Tenant, because Landlord had already terminated the Lease before discovering the extensive property damage, Landlord cannot recover from Tenant. This interpretation of the Lease renders Tenant's obligations meaningless and Landlord's remedy illusory.

Tenant argues that the repair and maintenance obligations set forth in Article 6 do not conflict with Section 26.01 because they do not specify a remedy. According to Tenant, if Tenant violated its obligations under Article 6, Landlord could simply pursue the remedy set forth in Section 26.01—termination of the Lease. (Appellees' Brief 18). As illustrated by the facts in this particular case, termination was an entirely ineffective and illusory remedy for Landlord, who was stuck with over $2 million in property damages after he had already terminated the Lease for other reasons. In this way, Section 26.01 conflicts with Tenant's express maintenance and repair obligations set forth in Article 6.

-6-

## B. Section 26.01 Conflicts with Section 8.01

To further highlight the contradictory and illusory nature of the termination remedy, Landlord highlighted Section 8.01 in its Opening Brief. Section 8.01 of the Lease provides in part as follows:

> If, at any time during the term of this Lease, the Building or any part thereof shall be damaged or destroyed by fire or other casualty (***including any casualty for which insurance coverage was not obtained or obtainable***) . . . the Tenant, at its sole cost and expense, and ***whether or not the insurance proceeds, if any***, ***shall be sufficient for the purpose***, shall proceed with reasonable diligence . . . to repair, alter, restore, replace or rebuild the same as nearly as possible to its value, condition and character immediately prior to such damage or destruction.

(J.A. 164) (emphasis added). Termination would be an entirely illusory remedy if Tenant failed to uphold its Section 8.01 obligations.

Landlord provided the following example: if the Premises were destroyed by fire, and the Tenant absconded with the insurance proceeds, Landlord's only remedy (according to Tenant) would be to terminate the Lease. Tenant takes issue with the example presented by Landlord for several reasons. First, Tenant attempts to avoid the plain conflict between Section 8.01 and Section 26.01 by raising a ripeness argument—specifically, that Section 8.01 is not implicated by the facts of the present case, and courts are supposed to decide only "actual, present controversies" instead of controversies that are "merely hypothetical and speculative." (*See* Appellees' Brief, at 22-23). Tenant's argument is inapposite,

-7-

however, because there *is* an actual, present controversy between the two parties as to the *interpretation* of the Lease, which "should be read and interpreted *as an entirety*."[2] *See, e.g.*, *Allen v. Highway Equipment Co.*, 239 N.W.2d 135, 139 (Iowa 1976). Moreover, the situation presented by Landlord is relevant to the actual, present controversy in this case, because it shows that Section 26.01 would also provide an illusory remedy for Tenant's violation of Section 8.01, *just as it provides an illusory remedy for Tenant's violation of the maintenance and repair obligations that are directly at issue in this case.*

Second, Tenant argues that Article 7 would prevent Tenant from "absconding" with much, if any insurance proceeds, and third, if Tenant did abscond with the insurance money, Tenant could be sued on a number of extra-contractual claims. (*See* Appellees' Brief at 24-25). However, Section 8.01 still applies—meaning Tenant still is required to repair, alter, restore, replace or rebuild the Premises—regardless of whether Tenant receives insurance proceeds. Even if Tenant did not obtain insurance, Tenant still could violate its obligations under Section 8.01, and the remedy provided by Section 26.01 still would be an illusory

---

[2]  The cases cited by Tenant for the proposition that general ripeness doctrine "has plain application to the adjudication of contractual disputes" are factually distinguishable from this case. In the *Holmes* case, for example, the cross-appellants asked the court of appeals to *modify a decision* on a set of entirely hypothetical facts. *See Holmes v. Pension Plan of Bethlehem Steel Corp.*, 213 F.3d 124 (3d Cir. 2000). That scenario is entirely different from the present case, in which Landlord simply asks the court to examine the contract in its entirety.

-8-

one.  If the Premises burned down, Tenant could simply abandon the Premises without repairing them, despite its explicit promise to do so, and Landlord's only remedy would be termination of the Lease.  In this way, Section 8.01 conflicts with Section 26.01 of the Lease.

### C.    Section 26.01 Conflicts with Section 13.01

With regard to the conflict between Section 13.01 and Section 26.01, Tenant raises the same ripeness argument it raised in its discussion of Section 8.01—that any consideration of the conflict would be "abstract and hypothetical" because Landlord did not utilize Section 13.01 in this case.  (Appellees' Brief at 27).  As noted above, because contracts should be interpreted in their entirety, Tenant's argument is without merit.

Tenant then asserts that Section 13.01 and Section 26.01 do not conflict in any way—they "simply provide for alternative mechanisms Landlord can use, at Landlord's election, in the event of purported default under the Lease by Tenant." (Appellees' Brief at 27).  Landlord disagrees—the very fact that Section 13.01 provides for an "alternative" remedy means that it directly conflicts with Section 26.01's statement that the "*sole* remedy" of Landlord is termination if the Tenant defaults.

Notably, the District Court cited that Landlord could have used Section 13.01's grant of authority, along with Section 4.06 and Article 12, to seek the $2.2

-9-

million in damages as "additional rent" if it had taken specific steps. (*See* J.A. 835-836).   Specifically, the District Court explained that Landlord could have recovered funds under Section 13.01 for Tenant's violations of its repair and maintenance obligations by taking the following steps: (1) giving Tenant written notice of the defaults; (2) allowing Tenant a reasonable time to try to remedy the defaults; (3) expending its own funds to remedy the default; and (4) recouping the funds as "additional rent." (*Id.*).   In this case, Landlord had already terminated the Lease for other reasons before it discovered the damages.   But the District Court's rationale clearly demonstrates that termination is not the ***sole*** remedy for Landlord.

### D.   Section 26.01 Conflicts with the Indemnification Provisions

Certain indemnification provisions set forth in Article 6 also conflict with Section 26.01 because they, like Section 13.01, set forth other remedies despite Section 26.01's clear statement that Landlord's ***sole*** remedy for Tenant's default is termination.   Tenant asserts that these indemnification provisions do not conflict with Section 26.01 because they contemplate that Tenant will indemnify Landlord against third-party claims, not for damages caused by Tenant's defaults.   However, the District Court in this case expressly recognized that "indemnity" can refer to ***direct*** liability as well as third-party liability.   (J.A.  833-834) (citing 41 Am. Jur. 2d Indemnity § 1).   The District Court also found that Sections 6.04, 6.08, and 6.12

-10-

do not specify whether they relate only to third-party claims or to both third-party and direct claims. (*Id.*).

Section 6.04 provides that Tenant shall "take good care of the property," maintain the property "in first class order, repair and condition," and that "Tenant shall indemnify and hold the Landlord harmless of and from any and all claims or demands, upon or arising out of any accident, injury or damage to any person or property." (J.A. 154). Section 6.08 provides in relevant part that Landlord "shall not be responsible or liable for any damage or injury to any property . . . or to any person at any time on the Demised Premises," and that Tenant will "indemnify and hold the Landlord harmless" from damages "arising from injury to persons or property." (J.A. 156-157). Landlord maintains that these indemnification provisions must be read to apply to third-party claims **and** to direct claims.[3]

It is even clearer that Section 6.12 was designed to apply to third-party claims **and** to direct claims, because Section 6.12 is a stand-alone indemnification

---

[3] According to Tenant, Section 6.04's and Section 6.08's use of the phrase "hold the Landlord harmless" makes it clear and unambiguous that these sections require Tenant to indemnify Landlord from third-party claims, **not** from claims Landlord has against Tenant. (Appellees' Brief at 30). However, the case cited by Tenant simply finds that "hold harmless" is synonymous with "indemnify" and that the "***common*** meaning of 'indemnify' is 'to reimburse (another) for a loss suffered because of a third party's or one's own act or default.'" *Estate of Pearson v. Interstate Power & Light Co.*, 700 N.W.2d 333, 344 (Iowa 2005) (citing Black's Law Dictionary 783-84 (8th ed. 2004)). While third party reimbursement may be the "common" definition, "indemnify" can also apply to first party liability, a fact that the District Court expressly recognized. (J.A. 833-834).

-11-

provision which provides even broader indemnification language than the language in Sections 6.04 and 6.08. Section 6.12 provides in its entirety:

> The Tenant will ***indemnify, protect and save harmless the Landlord from and against each and every claim,*** demand, fine, penalty, cause of action, liability, ***damage***, judgment or loss, of whatsoever kind or nature, to which the Landlord may be subject or which the Landlord may sustain, including without limitation, reasonable attorneys' fees, costs and other expense by the Landlord in defending against the same, ***resulting from any violation by the Tenant or any failure of the Tenant in the performance of any of the covenants or agreements contained in this Article 6*** or in any other Article of this Lease or from any other matter or thing growing out of the Tenant's use and occupancy of the Premises.

Tenant argues that the inclusion of the phrase "protect and save harmless" must mean Section 6.12 applies to third-party claims, "because to interpret it otherwise would mean Tenant was promising to 'protect' Landlord from Tenant, itself—a plainly nonsensical interpretation." (Appellees' Brief at 31). But that is not non-sensical—Landlord certainly would want to protect itself from Tenant in particular instances, and the inclusion of "indemnify, protect, and save harmless" ***broadens*** Tenant's indemnification obligations. In Section 6.12, Tenant promises to indemnify Landlord from damage "***of whatsoever kind or nature*** . . . resulting from ***any*** failure of the Tenant in the performance of ***any*** of the covenants or agreements" in the Lease, specifically those found in Article 6. In this way, Section 6.12's broad indemnification language squarely conflicts with Section 26.01's statement that termination is Landlord's ***sole*** remedy.

-12-

### E. Contracts Must be Read in Their Entirety, and Repugnant Clauses May be Disregarded by the Court

As noted in its Opening Brief, Iowa courts recognize that "a contract shall be read and *interpreted as an entirety rather than seriatim by clauses* and that the position of clauses in such instrument is not material or controlling." *Mealey v. Kanealy*, 226 Iowa 1266, 1277 (1939). "When the interpretation of a contract depends on the credibility of extrinsic evidence or on a choice among reasonable inferences that can be drawn from extrinsic evidence, the question of interpretation is determined by the finder of fact." *The Pillsbury Co., Inc.*, 752 N.W. 2d430, 435 (Iowa 2008). Where provisions of the contract conflict, the whole meaning of the contract may be ambiguous, which creates a genuine issue of material fact. *Teig & Johnson v. Speelmon*, 261 Iowa 210, 216 (1967). In some cases, if a contractual provision is found to be repugnant to the general purpose and intent of the instrument, it may be disregarded by the court entirely as a matter of law. *Mealey*, 226 Iowa at 1277.

Tenant takes issue with Landlord's reliance on *Mealey*, arguing that *Mealey* "merely recited" that "a clause repugnant to the general purpose and intent of the contract may be disregarded" and that the court "rejected that rule in favor of the majority rule requiring the contract to be interpreted as a whole." (Appellees' Brief at 33). Tenant misrepresents the holding of *Mealey*, in which the court rejected the following rule: "where there are two provisions in a contract, one repugnant and

-13-

contradictory to the other, the former will stand and the latter will be rejected." *Id.* at 1268, 1276-77; *see also Teig & Johnson*, 261 Iowa at 215 ("We no longer recognize **the position** of totally repugnant clauses in a contract as a proper rule of construction.") (citing *Mealey*, 226 Iowa at 1277). The *Mealey* court explicitly stated that this "rule of priority of clauses" "**must not be confused** with the rule that a proviso or clause which is repugnant to the general purpose and intent of a contract will be disregarded no matter where located in the contract." *Mealey*, 226 Iowa at 1268 (emphasis added); *see also De Stefano v. Apt Downtown, Inc.*, 879 N.W.2d 155 (Iowa 2016) (suggesting a clause in a lease stating that tenant waives the implied warranty of habitability would be a "repugnant clause" that courts could refuse to enforce).

By conflicting with several provisions of the Lease and rendering several of the provisions illusory, Section 26.01 is repugnant to the general intent and purpose the Lease and can be disregarded. Accordingly, Landlord requests that this Court reverse and remand the District Court's Summary Judgment Order, with instructions to the District Court that Section 26.01 is ambiguous and repugnant to the Lease when it is considered in its entirety.

## IV. SECTION 26.01 OF THE LEASE IS AMBIGUOUS BECAUSE ITS LANGUAGE IS SUSCEPTIBLE TO TWO INTERPRETATIONS

Landlord maintains that Section 26.01 is ambiguous because there is a genuine uncertainty as to the meaning of "personal liability" as used therein, and

-14-

extrinsic evidence indicates that the parties did not intend Section 26.01 to exculpate Tenant from liability.

Tenant cites to a number of cases that reinforce the Landlord's position, particularly the *Van Sloun v. Agans Bros.* and *Walsh v. Nelson* cases from the Iowa Supreme Court. Because a lease is a contract, courts apply ordinary contract principles to determine its meaning and legal effect. *Van Sloun v. Agans Bros.*, 778 N.W.2d 174, 179 (Iowa 2010). Where, as in the present case, "the dispute centers on the meaning of certain lease terms, [the courts] engage in the process of interpretation, rather than construction." *Id*. The essential goal when interpreting a lease is to ***ascertain the parties' intent at the time they executed the lease***. *Walsh v. Nelson*, 622 N.W.2d 499, 503 (Iowa 2001). The first step in contract interpretation is to determine, from the words chosen, what meanings are reasonably possible. *Id*. A ***term is ambiguous if***, after all pertinent rules of interpretation have been considered, ***a genuine uncertainty exists concerning which of two reasonable interpretations is proper***. *Id.*

Section 26.01 provides that "Tenant shall have no ***personal liability***" and that the "sole remedy of Landlord shall be to terminate this Lease." (J.A. 190).[4]

---

[4]    Tenant argues that "[t]he fact that the exculpation provision is reciprocal, such that neither party shall have 'personal liability' to the other for default under the Lease is plainly indicative that this was a bargained for term and intended by the parties to mean precisely what it says." (Appellees' Brief at 17). This interpretation ignores the fact that Landlord was an ***individual***, and Tenant was a

-15-

Because there is more than one reasonable interpretation of the phrase "personal liability" in this context, Section 26.01 is ambiguous. One reasonable interpretation of "personal liability" as it is used in Section 26.01 is that it reflects Tenant's desire to contract around the doctrine of corporate veil piercing, and to protect Tenant's shareholders, officers, and/or directors from being held "personally liable" for the debts of the Tenant corporation, similar to how Section 26.02 protected Mr. Kadish from personal liability if there was a default of his obligations as landlord.

Tenant correctly points out that when interpreting the provisions of a contract, the court must "give effect to the language of the entire contract in accordance with its commonly accepted and ordinary meaning." (Appellees' Brief at 38) (citing *Magina v. Bartlett*, 582 N.W. 2d 159, 163 (Iowa 1998)). However, contrary to Tenant's contentions, the definition of "personal liability" does not "turn on the definition of 'person'" in this case. The ***entire phrase*** "personal liability" and the context in which "personal liability" is generally used is what makes Section 26.01 ambiguous. Thus, Tenant's efforts to point to "person" as it is defined in the Iowa Code and in various dictionaries is misplaced and unpersuasive. (Appellees' Brief at 39).

---

corporation at the time the Lease was entered into. The reciprocal language providing that Landlord cannot be held "***personally*** liable" for default under the Lease suggests that the clause was intended to protect ***individuals.***

-16-

Tenant further argues that "substantial case law in both Iowa and other jurisdictions observe that corporations can, and do, have personal liability." (Appellees' Brief at 40). However, Tenant does not cite to one case interpreting a contract which states that a *corporation* "shall have no personal liability" for its defaults under the contract. Instead, nearly all of the cases cited by Tenant involve instances when a successor corporate entity attempts to shield assets from parties that have a judgment against its predecessor corporate entity. This situation is analogous to the corporate veil piercing scenario, which permits a party to pierce the corporate veil to hold a corporation's shareholders personally liable.

All of the Iowa cases cited by Tenant refer back to a 1908 Supreme Court case discussing corporate successor liability—*Luedecke v. Des Moines Cabinet Co.*, 118 N.W. 456, 457 (Iowa 1908). In *Luedecke*, as part of its discussion of corporate successor liability, the court explained that "[t]he statutes of this State . . . prohibit the diversion of corporate funds to other objects than those mentioned in its articles . . . and it is a well-settled rule of the common law *that the stockholders of a corporation can not divide its property or assets among themselves* without first paying the corporate debts." *Id.* (emphasis added). This is the exact rationale underlying the doctrine of corporation veil piercing, and it shows that courts likely use the phrase "personal liability" in the successor liability

-17-

context to describe instances when a party pursues claims against a successor corporation *and its stockholders*.

Further, the use of the phrase "personal liability" in the successor liability context makes sense because corporate entities may change from an entity in which stockholders generally *can* be held personally liable (i.e., a partnership) to a corporate entity in which stockholders generally *cannot* be held personally liable (i.e., a corporation). In fact, the only case cited by Tenant that involved the interpretation of a contractual provision involved a lease that exculpated a *partnership-*lessee from "personal liability." *See In re Riverside Nursing Home*, 102 B.R. 357, 361-61 (Bankr. S.D.N.Y. 1989). Exculpating a partnership from "personal liability" makes sense, because the partners that make up a partnership generally have personal liability to creditors. The exculpatory clause in the *Riverside* case was much more detailed than the clause in this case, and it explained that the covenants in the lease were intended solely for the purpose of binding the leasehold estate and not the partnership. *Id.* Tenant's cherry-picking of cases that use the phrase "personal liability" to describe the successor liability of corporate entities does not mean that "personal liability" as it is used within Section 26.01 is clear and unambiguous.

Tenant's and the District Court's emphasis on Article 5 of the Lease is likewise misplaced. Article 5 provides that Tenant shall hold funds received in

Appellate Case: 16-3228    Page: 21    Date Filed: 11/29/2016 Entry ID: 4473858

trust for the payment of the current month's rent, "and to the extent such funds are not so applied Tenant shall have **full personal liability to Landlord**, **the provisions of Section 26.01 notwithstanding**."  (J.A. 152) (emphasis added).  According to the District Court, "Article 5 demonstrates that the parties were aware Section 26.01 would generally apply and took care to draft around Section 26.01's liability waiver when necessary." (*See* J.A. 829).  But the District Court's interpretation is improper and in conflict.  Article 5 was not drafted to contract around Section 26.01's "liability" waiver; it was drafted to contract around Section 26.01's "**personal** liability" waiver.  Article 5 reflects the parties' intent to let Landlord pierce the corporate veil of Tenant and to hold Tenant's shareholders, directors, and/or officers "personally liable" if Tenant accepted the $259,308 in annual rent from Kmart, and absconded with that rent rather than pay Landlord.

Because the meaning of Section 26.01's phrase "personal liability" is ambiguous on its face, the District Court should have analyzed the extrinsic evidence presented to the Court, the unrebutted Affidavit of Landlord.  In a footnote, the District Court rejected the extrinsic evidence as "not useful in determining the parties' intent **at the time the Lease was signed**."  (J.A. 826) (emphasis added). Tenant similarly seeks to dispose of the extrinsic evidence presented by Landlord in a footnote, arguing that the Mr. Kadish's Affidavit is of no import when interpreting contracts in order to determine the **mutual** intent of

-19-

the parties. (Appellees' Brief at 14). But the District Court and Tenant ignored that the ***only evidence*** before the Court is Lawrence Kadish's Affidavit—Tenant offered no rebuttal evidence. Furthermore, Mr. Kadish's Affidavit addressed both Landlord's and Tenant's intent at the time the Lease was signed—"it was not my understanding that the Exculpatory Clause ***was intended by the parties*** to preclude Landlord from recovering damages caused by the Tenant's defaults under the Lease or due to Tenant's tortious conduct, particularly upon termination of the Lease when taking into account Tenant's post surrender obligations." (J.A. 601) (emphasis added).

There are certainly two reasonable interpretations as to how the phrase "personal liability" in Section 26.01 could be interpreted: Tenant's interpretation that this phrase exculpates it from more than $2 million in repairs for its neglect of the property, and Landlord's interpretation that Section 26.01 does not relieve Tenant of its maintenance and repair obligations throughout the Lease, and instead only protects Landlord's ability to pierce the corporate veil and seek payment from Tenant's shareholders, officers, and/or directors. Because Section 26.01 is ambiguous and there is extrinsic evidence regarding the parties' mutual intent at the time the Lease was signed, the District Court should have considered the Affidavit of Mr. Kadish, and found that Section 26.01 was ambiguous.

Appellate Case: 16-3228   Page: 23   Date Filed: 11/29/2016 Entry ID: 4473858

## V.  CONCLUSION

For the foregoing reasons, Plaintiff-Appellant Davenport Chester, LLC respectfully requests that this Court reverse and remand the District Court's Summary Judgment Order with instructions that Section 26.01 should be disregarded as it is repugnant to the Lease when read in its entirety, or that Section 26.01 is ambiguous.

By: */s/ Michael T. Cappel*

| | |
|---|---|
| Daniel E. Izenson | Robert V.P. Waterman, Jr. |
| Michael T. Cappel | Douglas R. Lindstrom, Jr. |
| KEATING MUETHING & KLEKAMP PLL | LANE & WATERMAN LLP |
| One East Fourth Street, Suite 1400 | 220 N. Main Street, Suite 600 |
| Cincinnati, Ohio 45202 | Davenport, Iowa 52801 |
| Tel: (513) 579-6480 | Tel: (563) 333-6618 |
| Fax: (513) 579-6457 | Fax: (563) 324-1616 |
| dizenson@kmklaw.com | bwaterman@l-wlaw.com |
| mcappel@kmklaw.com | dlindstrom@l-wlaw.com |

*Attorneys for Plaintiff- Appellant Davenport Chester, LLC*

-21-

## CERTIFICATE OF COMPLIANCE – RULE 23(a)

1.    Plaintiff-Appellant's Reply Brief complies with the type-volume limitation of Fed.R.App.P. 32(a)(7)(B) because: this brief contains 4,938 words, excluding the parts of the brief exempted by Fed.R.App.P. 32(a)(7)(B)(iii).

2.    Plaintiff-Appellant's Reply Brief complies with the typeface requirements of Fed.R.App.P. 32(a)(5) and the type style requirements of Fed.R.App.P. 32(a)(6) because: this brief has been prepare din a proportionally spaced typeface using Microsoft Word in Times New Roman 14 point.

*/s/ Michael T. Cappel*
Michael T. Cappel
*Attorneys for Plaintiff- Appellant*
*Davenport Chester, LLC*

## CERTIFICATE OF COMPLIANCE – CIRCUIT RULE 28A(h)

The undersigned hereby certifies that an electronic version of the brief has been filed as a PDF generated by printing to PDF from the original word processing file, and the electronic version of the brief has been scanned for viruses and the brief is virus-free.

*/s/ Michael T. Cappel*
Michael T. Cappel

## CERTIFICATE OF FILING AND SERVICE

I hereby certify that on November 29, 2016, I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Eighth Circuit by using the CM/ECF system. I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

*/s/ Michael T. Cappel*
Michael T. Cappel

7209250.1

-22-